UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SUNNYLAND FARMS, INC.,                                  Case No. 14-10231-t11

    Debtor.

## MEMORANDUM OPINION

       Before the Court is whether to confirm the Debtor's Fourth Amended Chapter 11 Plan (the "Plan"). Dalsem Horticultural Products, B.V., Johnson & Nelson, P.C., and Nick Sauro (together the "Objecting Creditors") timely objected to confirmation, arguing that the Plan was not proposed in good faith and is not feasible. The Objecting Creditors also argue that the Debtor did not get the votes required for confirmation. After the confirmation hearing the Debtor agreed to modify the Plan to resolve a dispute with the Internal Revenue Service ("IRS"). For the reasons set forth below and based on the Debtor's proposed Plan modification, the Court concludes that the Plan meets the requirements of § 1129[1] and should be confirmed.

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.

I.  FACTS

The Court finds[2] the following facts:[3]

The Debtor is a New Mexico corporation that owns a greenhouse in Grants, New Mexico (the "Grants Greenhouse"). The Grants Greenhouse has not been operated for years and is in very poor repair. It is not insured.

John Stockwell ("Stockwell") formed the Debtor in 2003. Stockwell, a Canadian citizen, is Debtor's President and sole shareholder. Debtor then purchased the assets of Agstar of New Mexico, Inc. ("ANM"), including the Grants Greenhouse and a 20-acre greenhouse in Estancia, New Mexico. As part of the transaction Debtor assumed ANM's obligations to Farm Credit Services of the Mountain Plains, PCA ("Farm Credit") under a $8,500,000 secured loan (the "Farm Credit Loan").

Stockwell, his wife Lynn Stockwell, and their children were substantial shareholders of Agstar Power Incorporated ("API"), the corporate parent of ANM. As part of the purchase transaction the Stockwells agreed to relinquish their API stock. As compensation the Debtor issued notes to Mrs. Stockwell and the children, including a $12,797,282 note to Mrs. Stockwell. This debt has been on the Debtor's books since 2003.

---

[2] In making these findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir.1979) (holding that a court may, sua sponte, take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir.1999) (citing Fed.R.Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket"); *In re Quade*, 496 B.R. 520, 524 (Bankr.N.D.Ill.2013) (a "bankruptcy court [is authorized] ... to take judicial notice of its own docket").

[3] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

Not long after the asset purchase closed one of Debtor's employees inadvertently started a fire at the Estancia greenhouse. Unbeknownst to Debtor, the Central New Mexico Electric Cooperative ("CNMEC") had shut off Debtor's electricity at the greenhouse. Without electricity Debtor could not pump water to fight the fire, and the Estancia greenhouse was destroyed.

Debtor filed suit against CNMEC in 2005, alleging that CNMEC wrongfully disconnected the electricity service. After a bench trial the state district court awarded Debtor about $21 million in damages.[4] In 2011 the New Mexico Court of Appeals reversed the judgment in large part, effectively awarding Debtor little more than its attorney fees.[5] On further appeal, in 2013 the New Mexico Supreme Court reversed the Court of Appeals' decision in part, increasing Debtor's award to about $7.4 million.[6] CNMEC paid this judgment amount. After attorney's fees were deducted Debtor was left with about $5.45 million in cash (the "Funds"), which are now held in the state court's registry. Debtor's only substantial assets are the Grants Greenhouse and the Funds.

---

[4] *See* Case No. D-1333-CV-2005-00192. The state district court awarded Debtor $21,354,882 for breach of contract "without application of comparative fault" and "$100,000 punitive damages for fault occurring after the breach of contract" with post-judgment interest to accrue at 8.75%. The court also awarded Debtor $21,354,882 for negligence with post judgment interest to accrue at 15%. The court applied comparative fault principles to the negligence award and held Debtor was 80% at fault. Finally, the court granted CNMEC a $3 million setoff.

[5] *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 255 P.3d 324 (N.M. App. 2013). The New Mexico Court of Appeals reversed the breach of contract, punitive damages, and related post-judgment interest awards. The Court of Appeals upheld Debtor's negligence award but also CNMEC's right of offset. Debtor's negligence award, reduced by 80% comparative fault, totaled about $4.27 million. CNMEC's setoff amount, as established by the Court of Appeals, was $3.2 million. Before attorney's fees were paid, Debtor's award amounted to a little over $1 million.

[6] *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 301 P.3d 387 (N.M. 2013).

Between the two appellate court decisions Farm Credit decided to cut its losses and sell the Farm Credit Loan for what it could get. Farm Credit apparently concluded it might never collect the loan. When the loan went up for sale Stockwell became very interested in buying it. Stockwell planned to borrow the purchase price from business acquaintances in Canada (Ernest Mailloux and Craig Lanoue), and pledge the loan as collateral.

Days before the scheduled July, 2011 closing of the Farm Credit Loan sale to Stockwell, Stockwell's New Mexico counsel advised him that buying the loan might result in claims of breach of fiduciary duty. Based on the advice Stockwell arranged for 1670083 Ontario, Inc., a Canadian corporation ("Ontario"), to buy the loan instead. Ontario is owned by Messrs. Mailloux and Lanoue.

Ontario paid $500,000 for the Farm Credit Loan, currently owns the loan, and is the Debtor's main secured lender. The loan balance is about $8 million. Ontario has first liens on the Grants Greenhouse and the Funds, which together are worth significantly less than the loan balance.

Even after closing Stockwell did not give up his interest in buying the Farm Credit Loan. Several documents were drafted and circulated at about the time of the sale to Ontario that would have given Stockwell the right to buy, directly or indirectly, the Farm Credit Loan and/or Ontario's stock. Ultimately, however, Stockwell never purchased the loan or the stock, and in October, 2013 Stockwell, Mailloux, and Lanoue officially terminated Stockwell's rights (to the extent he had any) to buy either.

As part of the Plan Ontario has agreed to "carve out" a portion of the Funds (the "Carve Out") for use to pay creditors. All initial Plan payments would be funded by the Carve Out.

The Plan allows unsecured creditors to choose a 1% cash dividend on their allowed claim or one share of stock for each dollar of the claim. Cash payments would be made 30 days after the Plan's effective date.

The Debtor proposes in the Plan to bring the Grants Greenhouse back into operation through post-bankruptcy loans from Ontario and Lynn Stockwell, both of whom have elected to receive stock for the unsecured portions of their claims. Initially the reorganized Debtor would be managed by Jack Benne. Stockwell would retain no equity interest or managerial control.

The IRS filed a proof of claim on June 17, 2014, claiming a $459,273.27 priority claim and an $862,797.18 general unsecured claim. Debtor did not object to the IRS claim.

The Debtor objected to the claims of Jerry Capussi ($3,262,474) and JC Fresh Farms ($370,800) on September 5, 2014, and to the claims of Dalsem Horticultural Products, B.V. ($3,371,130) and Johnson & Nelson, P.C. ($636,039) on October 27, 2014 (together, the "Disputed Claims" held by the "Disputed Claimants"). No Disputed Claimant ever sought temporary allowance of its Disputed Claim for voting purposes. If the claim objections are sustained, the Disputed Claims will be reduced from about $7,640,443 (the claimed amount) to about $207,098 (the amount not objected to), a reduction of about 97.3%.

Under the Plan the Debtor would have to pay about $308,600 to pre-petition creditors 30 days after the effective date, broken down as follows:

-5-

| Creditor | Claim amount | Plan payment |
|---|---|---|
| City of Grants | $ 101,064 | $100,000 |
| IRS priority | $ 459,273 | $ 50,000 |
| NM Tax. and Rev. Dept. ("TRD") | $ 43,058 | $ 40,000 |
| NM Dept. of Labor ("DOL") | $ 41,584 | $ 50,000 |
| Unsecured creditors | $10,682,004 | $ 68,618[7] |
| Total | | $308,618 |

The Plan has five classes of claims entitled to vote: Class 3(A) (Ontario secured); Class 3E (City of Grants secured); 3(R) (TRD secured); Class 3(T) (DOL secured); and Class 5 (unsecured). Ontario, City of Grants, and DOL voted to accept the Plan. TRD did not vote.

The Class 5 creditor votes are listed below. Disputed Claims are in italics:

| Creditor | Claim Amount | Accepted | Rejected |
|---|---|---|---|
| Albuquerque Packaging Co. | $ 142,819 | $ 142,819 | |
| Bevo Farms | $ 350,000 | $ 350,000 | |
| Continental Divide Electric Coop. | $ 21,727 | $ 21,727 | |
| *Dalsem Horticultural Products, B.V.* | *$3,371,130* | | *$3,371,130* |
| *J.C. Fresh Farms* | *$ 370,800* | | *$ 370,800* |
| Jenna McKie | $ 16,400 | $ 16,400 | |
| Jeremy Stockwell | $ 184,000 | $ 184,000 | |
| *Jerry Capussi* | *$3,282,474* | | *$3,282,474* |
| John Wright | $ 149,503 | $ 149,503 | |
| *Johnson & Nelson, P.C.* | *$ 636,039* | | *$ 636,039* |
| Kenneth Lujan | $ 150,000 | $ 150,000 | |
| Nick Sauro | $ 429,414 | | $ 429,414 |
| Ontario (deficiency)[8] | $2,802,439 | $2,802,439 | |
| Shulgan, Martini and Marusic, LLP | $ 35,000 | $ 35,000 | |
| Subtotal: | $11,941,745 | $3,851,888 | $8,089,857 |

---

[7] Calculated by assuming that the Disputed Claims would be allowed at 50%. The Court has no idea what amounts ultimately will be allowed.

[8] Ontario filed a proof of claim in this case of $7,946,126.88. Ontario's unsecured portion was calculated by subtracting from this amount the Funds balance ($5,452,305.50), then adding the estimated amount of the Carve Out ($308,617.83). The result is $2,802,439.21.

-6-

If the Disputed Claim Votes Are Counted:

| Number of Creditors Accepting Plan | | 9 | |
|---|---|---|---|
| Number of Creditors Rejecting Plan | | | 5 |
| Percentage of Creditors Voting | | 64.29% | 35.71% |
| Percentage of Dollar Value Voting | | 32.26% | 67.74% |

If the Disputed Claim Votes Are Not Counted:

| Number of Creditors Accepting Plan | | 9 | |
|---|---|---|---|
| Number of Creditors Rejecting Plan | | | 1 |
| Total claim amount voting on Plan | $4,281,302 | $3,851,888 | $429,414 |
| Percentage of Creditors Voting | | 90% | 10% |
| Percentage of Dollar Amount Voting | | 89.97% | 10.03% |

II.  DISCUSSION

A.  Does the Plan Comply with § 1129?

1.  Duty to Ensure Compliance.  The Court has an "independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied, even if no objections to confirmation have been made." *In re Young Broadcasting Inc.*, 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010); *Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir. 1988) (court "has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation"); *Liberty Nat'l Enterprises. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) ("The bankruptcy court had an affirmative duty to ensure that the Plan satisfied all 11 U.S.C. § 1129 requirements for confirmation."); *Ala. Dep't of Econ. and Cmty. Affairs v. Ball Healthcare-Dallas, LLC (In re Lett)*, 632 F.3d 1216, 1220 (11th Cir. 2011) (same).  *See also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 (2010) (in connection with a Chapter 13 case, the Supreme Court stated "the Code makes plain that bankruptcy courts have the authority—indeed, the

obligation—to direct a debtor to conform his plan to the requirements of §§ 1328(a)(2) and 523(a)(8)").

        2.     <u>Evidence in Support of Confirmation</u>.  Stockwell, the only witness, testified at the February 11, 2015 final hearing in support of Plan confirmation.  The Objecting Creditors cross-examined Stockwell on the issues of good faith, feasibility, and voting.  The Objecting Creditors also introduced 26 exhibits into evidence.

The Objecting Creditors did not argue that the Plan violated §§ 1129(a)(1)-(a)(2), (a)(4)-(a)(7), (a)(10),[9] or (a)(12)-(a)(16), nor did they introduce evidence of such violation.  The Court therefore concludes that the Plan complies with each of these confirmation requirements, and will focus on the remaining four subsections of § 1129(a).

    B.     <u>§ 1129(a)(3) (Good Faith)</u>.

A plan must be proposed in good faith and not by any means prohibited by law.  11 U.S.C. § 1129(a)(3).  The Bankruptcy Code does not define "good faith."  "[W]hen considering whether a plan satisfies the § 1129(a)(3) requirement, the focus of the court must be on the plan itself."  *In re Dow Corning Corp.*, 244 B.R. 673, 675 (Bankr. E.D. Mich. 1999).  "In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions."  *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985).  Denial of confirmation for lack of good faith is "appropriate . . . [where] it is evident that the debtor seeks

---

[9] The Objecting Creditors argued in passing that Ontario was a *de facto* insider.  There is some basis for this position, although the Court is not prepared to so hold.  Regardless, the Plan was accepted by the City of Grants and the DOL, impaired, noninsider creditors, so § 1129(a)(10) was satisfied even if the vote of Class 5 is disregarded.

-8-

merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Id.* "[P]lacing the amorphous concept of good faith outside the confines of all of the other elements for confirmation of the plan, even outside § 1129(b)'s cramdown requirements, is intended to allow courts to utilize their gut feeling about a plan's effects . . . ." *In re Dow Corning Corp.*, 244 B.R. at 676.

    1.    <u>Lynn Stockwell's Claim</u>.  In support of their good faith objection Objecting Creditors argue that Lynn Stockwell does not have a valid unsecured claim, and that allowing her to take stock in exchange for her claim is an improper way for Stockwell to preserve his equity.  The Objecting Creditors allege the Debtor does not, or should not, owe money to Lynn Stockwell for her surrender of API stock, and that if a debt exists it is owed by Stockwell rather than the Debtor.

The treatment of Lynn Stockwell's claim does not demonstrate Debtor's lack of good faith.  First, the debt to Mrs. Stockwell has been on Debtor's books for almost 12 years.  If the debt is subject to attack, it should have been challenged before now.  Second, Objecting Creditors could object to Mrs. Stockwell's claim.  *See* § 502(a); Fed. R. Bankr. P. 3007.  Under the Plan, they will have until 15 days after the effective date to do so.  Third, the Court does not have enough evidence to seriously question Lynn Stockwell's claim.  The Court understands the basic facts, and agrees with the Objecting Creditors that there *could possibly* be grounds to attack Mrs. Stockwell's claim, but the evidence before the Court is too conclusory to sustain such an attack or prove lack of good faith.

    2.    <u>Stockwell's Dealings with Ontario</u>.  Objecting Creditors also argue that the Plan was not proposed in good faith because it is based upon an undisclosed agreement

-9-

between Stockwell and Messrs. Mailloux and Lanoue for Stockwell to obtain the benefit of the Farm Credit Loan purchase.  The Court agrees that there are reasons to view the relationship between Stockwell and Ontario with a jaundiced eye.  Stockwell did want to buy the Farm Credit Loan, for one thing, and continued that quest for some time after Ontario bought the loan.  In addition, the Carve Out, the Debtor's retention of the Grants Greenhouse, and Ontario's post-confirmation loan all evidence significant flexibility and open-handedness on Ontario's part.  It seems unlikely that a hard-nosed, arm's length lender would agree to such terms; such a lender would be much more likely to take its collateral and get out.  Nevertheless, there is zero evidence of any improper agreement.  Ontario's flexible, generous attitude could be nothing more than the response of a lucky creditor in receipt of a windfall.[10]  The Court is not willing to find bad faith based on inference and innuendo.

Good faith should be considered in light of the alternatives.  Clearly, Ontario does not have to agree to the Carve Out or the other accommodating terms; it could seek stay relief and foreclose its liens on the Funds and the Grants Greenhouse, leaving unsecured creditors with nothing.  This would be the likely result of a plan of liquidation or conversion to Chapter 7.

During the course of this bankruptcy case the Objecting Creditors have argued that creditors would be better served by challenging Ontario's secured claim rather than reorganizing the Debtor.  To date the Objecting Creditors have not mounted such a challenge, although they have every right to do so through the claim objection process.

There is no evidence before the Court that such an attack on Ontario's lien position

---

[10] Since Ontario paid $500,000 for the loan, the "windfall" was in the neighborhood of $5,300,000, depending on the value of the Grants Greenhouse.

would be successful. On the contrary, whatever else might be made of the facts outlined above, Farm Credit had valid first liens on the Debtor's assets and sold its lien position to Ontario for valuable consideration in an arm's length transaction. A Chapter 7 trustee, inheriting an estate with no unencumbered assets, would not relish protracted, expensive, questionable litigation against Ontario.

A 1% cash dividend (or a small interest in the reorganized debtor) is little enough, but based on the evidence before the Court it appears better than the proposed alternative.

The Court finds that the good faith requirement of § 1129(a)(3) is met.

C. § 1129(a)(8) (Acceptance of Plan).

Section 1129(a)(8) requires that "each class of claims or interests . . . has accepted the plan; or such class is not impaired under the plan." All classes of creditors are impaired under the Plan, so Debtor needed to obtain the affirmative vote of all classes to comply with § 1129(a)(8). A class has accepted the plan "if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c). A class that does not vote is deemed to have accepted the Plan for § 1129(a)(8) purposes. *See Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263, 1266–67 (10th Cir. 1988).

All classes other than Class 5 either accepted the Plan or did not vote. Class 5 voted in favor of the Plan only if the Disputed Claims are not counted. The Objecting Creditors argue that the votes of the Disputed Claimants should be counted.

The Bankruptcy Code provides that "[t]he holder of a claim or interest allowed under section 502 . . . may accept or reject a plan." 11 U.S.C. § 1126(a). Section 502 states that a claim or interest is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). It follows that a creditor holding a disputed claim does not have an allowed claim for voting purposes. *See Bell Rd. Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 215 (9th Cir. BAP 1989) ("[U]ntil a party is deemed to have an 'allowed' claim, or actually has an allowed claim, it has no right to accept or reject a plan."); *In re Gardinier, Inc.*, 55 B.R. 601, 604 (Bankr. M.D. Fla. 1985) ("There can hardly be any doubt that a claim which is disputed [or] on which there is any objection pending, is not yet allowed and ordinarily would not be permitted to vote on a plan of reorganization.").

Fed. R. Bankr. P. 3018(a) states: "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." This rule gives creditors an avenue for voting on the plan when a party has objected to their claim. *See In re M. Long Arabians*, 103 B.R. at 215 (creditor with disputed claim "could not have voted on the plan unless it sought a timely allowance of its claim under Bankruptcy Rule 3018").

"The policy behind temporarily allowing claims is to prevent possible abuse by plan proponents who might ensure acceptance of a plan by filing last minute objections to the claims of dissenting creditors." *Armstrong v. Rushton (In re Armstrong)*, 294 B.R. 344, 354 (10th Cir. BAP 2003), *affirmed*, 97 Fed. Appx. 285 (10th Cir. 2004). In *Armstrong* the court held that a creditor could request temporary allowance when an "'objection [is] filed too late to be heard before the confirmation hearing, when fully hearing the objection would delay administration of

the case, or when the objection is frivolous or of questionable merit.'" *Id.* (citing 9 *Collier on Bankruptcy* ¶ 3018.01[5] (Lawrence P. King, ed., 15th ed. 2003). A debtor should not be able to disenfranchise a creditor "merely by its unilateral act of filing an objection to the creditor's proof of claim." *In re Goldstein*, 114 B.R. 430, 432 (Bankr. E.D. Pa. 1990); *In re Orosco*, 77 B.R. 246, 249 (Bankr. N.D. Cal. 1987) ("[A]lthough the filing of a claim objection initially operates to preclude the claimholder from accepting or rejecting a Plan, it also triggers a right on the part of the claimholder to request a temporary allowance for purposes of voting, and thus, to participate in the balloting process."); *Stone Hedge Props. v. Phoenix Capital Corp. (In re Stone Hedge Props.)*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995) ("A creditor whose claim is objected to is therefore disenfranchised from voting on the plan unless the objection is adjudicated prior to plan voting or a mechanism, such as temporary allowance, is provided for.").

The Disputed Claimants have never sought temporary allowance of their claims for voting purposes, even though the claim objections, which do not appear to be frivolous, were filed last fall. Without temporary allowance the Disputed Claimants may not vote, and without their vote Class 5 clearly accepted the Plan. The Plan therefore satisfies § 1129(a)(8).[11]

D. § 1129(a)(9) (Priority Claims).

In general, priority tax claims must be paid within five years from the petition date, with interest. § 1129(a)(9)(C). Here, the Plan allows for a single $50,000 payment to the IRS on account of its priority claim. This amount is far short of IRS's $459,263.27 priority claim. The problem was fixed by a post-hearing Plan modification, under which the Debtor will pay the IRS

---

[11] Because § 1129(a)(8) is satisfied, the Court does not need to consider the § 1129(b) "cramdown" provisions.

priority claim as required by § 1129(a)(9).

Pre-confirmation plan modifications are expressly permitted. *See* 11 U.S.C. § 1127(a). Section 1127(a) is "'designed to implement the negotiation process, which is the essence of the formulation of any plan of reorganization.'" *JM Convenience Corp. v. Split Second Towing & Transp. Inc. (In re Split Second Towing & Transp. Inc.)*, 2010 WL 3385482, at *4 (M.D. Fla. 2010) (quoting *In re Winn-Dixie Stores, Inc.*, 377 B.R. 322, 335 (M.D. Fla. 2007), affirmed, 286 Fed. Appx. 619 (11th Cir. 2008). If a modification adversely affects the interests of a creditor who has previously accepted a plan, that creditor should have the opportunity to reconsider and change his or her vote. *Id.* (citing *In re Frontier Airlines, Inc.* 93 B.R. 1014, 1023 (D. Colo. 1988)). Here, the Court concludes that the modification of the treatment of the IRS's claim will not have a material effect on other creditors, and therefore does not require re-voting. The Court concludes that the Plan as modified complies with § 1129(a)(9).

E. § 1129(a)(11) ("Feasibility").

Finally, § 1129(a)(11) provides that a plan may only be confirmed if it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." The Objecting Creditors argue the Plan does not comply with this "feasibility" requirement.

"'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise[] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" *In re Pikes Peak Water Co.*, 779 F.2d at 1460, quoting *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). "In determining whether a plan is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *Id.* (citing *In re*

*Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1984)). *See also Bank One, NA v. Blackwater Farms, Inc. (In re Baker)*, 302 B.R. 112, at *2 (10th Cir. BAP 2003) (plan is feasible if it "offers a reasonable prospect of success and is workable"). A debtor need not prove to a certainty that it will succeed. *Id.* Rather, a debtor need only support its plan with "projections that have some basis in fact and experience." *Id.* at *3 (citing *In re Snider Farms, Inc.*, 83 B.R. 1003, 1012 (Bankr. N.D. Ind. 1988)).

Here, the Debtor's plan provides for cash payments from the Carve Out, to be made within 30 days of the effective date. Payments do not rely on the future financial success of the reorganized debtor. There is no risk that "cash-out" unsecured creditors (i.e., everyone except Ontario and the Stockwell family members) would go unpaid if the reorganized debtor is unsuccessful. None of the parties electing to take stock instead of the 1% dividend objected to the plan or questioned feasibility.

The Court finds that the Debtor's plan is workable and bears a reasonable prospect of success. The Debtor has obtained post-confirmation financing that should allow it to rehabilitate the Grants Greenhouse. The reorganized debtor will be run by a manager with significant greenhouse experience. More to the point, all unsecured creditors that elected to receive cash will be paid from the Carve Out. The Plan is feasible and complies with § 1129(a)(11).

### III. CONCLUSION

The Debtor proposed a feasible plan, in good faith, and obtained the required votes. Initially the Plan did not properly treat IRS's priority tax claim, but that has been fixed. All requirements of § 1129(a) have been met. While the dividend to unsecured creditors unquestionably is meager, the Court does not believe that the Objecting Creditors' proposed

-15-

alternative (i.e., challenging Ontario's lien) would result in more money to creditors.

The Court will enter a separate order confirming the Plan.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: April 8, 2015.

Copies to:

Christopher M. Gatton
10400 Academy Rd., #350
Albuquerque, NM 87111

Robert A Johnson
P.O. Box 25547
Albuquerque, NM 87125

John Stockwell
90 Townline Road South
Leamington, Ontario N8H 4G2

Manual Lucero
P.O. Box 607
Albuquerque, NM 87103

Daniel White
320 Gold Ave., SW, #300A
Albuquerque, NM 87102