UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SUNNYLAND FARMS, INC.,                                        Case No. 14-10231-t11

        Debtor.

**MEMORANDUM OPINION**

        Before the Court is the Debtor's objection to Jerry Capussi's $3,264,287 proof of claim. The Court held a final hearing on the objection and took the matter under advisement. For the reasons set forth below, the Court will allow Mr. Capussi's claim in the amount of $108,000 and disallow the balance.

                                            I.        FACTS

        The Court finds[1] the following facts[2]:

        Debtor is a New Mexico corporation. At all relevant times Debtor's principal was John Stockwell ("Stockwell"), a Canadian citizen who lives in Kingsville, Ontario, Canada. Capussi is also a Canadian citizen, and a neighbor of Stockwell's. Capussi has been in the greenhouse farming business in Leamington, Ontario (next to Kingsville) for many years.

        In about 2003 Debtor purchased the assets of Agstar of New Mexico, Inc., including greenhouses in Grants and Estancia, New Mexico.

---

[1] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

[2] In making these findings, the Court took judicial notice of the docket, including the claims register. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir.1979) (holding that a court may, sua sponte, take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir.1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket"); *In re Quade*, 496 B.R. 520, 524 (Bankr.N.D.Ill.2013), *affirmed*, 498 B.R. 852 (N.D. Ill. 2013) (a "bankruptcy court [is authorized] ... to take judicial notice of its own docket").

At about the time of the acquisition, Stockwell approached Capussi and asked for assistance starting a greenhouse business in New Mexico. Although Capussi said he did not want to "get involved" in Stockwell's business venture, he did agree to help Stockwell get his business off the ground. Capussi's assistance included meeting with state officials, helping put together business plans, talking to potential vendors, traveling to New Mexico, providing meeting facilities, and the like. Later on, after the litigation described below had commenced, Capussi helped the Debtor find an expert witness, and also attended several settlement mediations.

Capussi worked on the Debtor's New Mexico greenhouse venture sporadically for a number of years. At no time did the parties have an agreement, written or oral, about how the Debtor would compensate Capussi for his efforts. This startling omission reflects poorly on both parties.

After the asset purchase closed in 2003, one of Debtor's employees inadvertently started a fire at the Debtor's Estancia greenhouse. Unbeknownst to Debtor, the Central New Mexico Electric Cooperative ("CNMEC") had shut off Debtor's electricity at the greenhouse. Without electricity, Debtor could not pump water to fight the fire, and the Estancia greenhouse was destroyed. The fire devastated the Debtor financially; the Debtor did not operate between 2003 and the petition date.

-2-

Case 14-10231-t11    Doc 248    Filed 08/18/15    Entered 08/18/15 16:31:29 Page 2 of 11

Debtor filed suit against CNMEC in 2005, alleging that the utility wrongfully disconnected Debtor's electricity service. After a bench trial the state district court awarded Debtor about $22 million in damages.[3] CNMEC appealed the judgment.

The Debtor had a number of creditors. In 2008 Stockwell asked his New Mexico attorney, Robert A. "Joe" Johnson, to prepare security agreements that Stockwell could give to Debtor's main unsecured creditors. Stockwell's idea was to assure the creditors they would get paid once the appeals process had run its course.

About a dozen security agreements were prepared by Mr. Johnson and sent by overnight courier to Stockwell in Canada, each one for a different creditor. In each instance, the agreement started as a pre-printed form. Some of the "boilerplate" in the form was crossed out. Language was typed in providing for accrual of interest at 8.75%. At the top of the first page and the bottom of the form, the names of the Debtor and secured party were typed in. All of the forms were dated October 27, 2008. The amount of the secured indebtedness was left blank.

In most cases the process for completing and signing the agreement was similar: Stockwell visited the creditor in person and showed it the partially completed security agreement. He and the creditor then negotiated the amount of the debt and Stockwell wrote that amount on the blank in the middle of the first page. Stockwell then initialed this handwritten debt amount and signed the agreement as President of the Debtor.

Capussi's security agreement was handled differently. Stockwell visited Capussi at his Leamington, Ontario office in late October or early November, 2008. Stockwell brought the

---

[3] *See* Case No. D-1333-CV-2005-00192. The state district court awarded Debtor $21,354,882 for breach of contract "without application of comparative fault" and "$100,000 punitive damages for fault occurring after the breach of contract" with post-judgment interest to accrue at 8.75%. The court also awarded Debtor $21,354,882 for negligence with post judgment interest to accrue at 15%. The court applied comparative fault principles to the negligence award and held Debtor was 80% at fault. Finally, the court granted CNMEC a $3 million setoff.

partially completed security agreement and showed it to Capussi. The parties discussed the agreement.[4] What happened next is the subject of sharp disagreement. Stockwell testified he left the security agreement with Capussi, with the understanding that they would figure out (by way of an "accounting" of some kind) how much the Debtor owed Capussi, and insert that amount into the indebtedness portion of the security agreement. Stockwell testified that he did not authorize Capussi to fill in any amount on the security agreement, and that the indebtedness portion was blank when he left the document with Capussi. Stockwell was adamant that no discussion about inserting $2 million as the amount of debt ever occurred. Stockwell pointed out that it would have been likely that he, rather than Capussi, would fill in the amount of the indebtedness because Capussi does not have the use of his right arm.

Capussi's recollection of the meeting is entirely different. Capussi testified that Stockwell produced a signed security agreement and told him "whatever you need Jerry, write it in there." Capussi testified that he wrote in $2 million during the meeting and showed that figure to Stockwell. Capussi testified that Stockwell made no objection. Later, when the Court questioned Capussi about the meeting, Capussi testified that he asked Stockwell "does $2 million sound right?" and Stockwell replied "I can live with that" or something to that effect.

The $2 million figure bears no relation to Capussi's advances or expenses, which from what the Court can tell were less than $110,000. There is no writing (other than the Security Agreement) Capussi can point to as a basis for the figure. To allow Capussi's claim for $2 million plus interest after October, 2008, the Court would have to find that Stockwell agreed to that amount during the meeting described above.

---

[4] Capussi made a hearsay objection to Stockwell's testimony about his own statements during their meeting. Stockwell did not object when Capussi testified to statements Capussi made to Stockwell at the meeting. The Court took Capussi's objection under advisement. *See* the discussion in Section II(C) below.

-4-

In 2011 the New Mexico Court of Appeals vacated the CNMEC judgment in large part, effectively awarding Debtor little more than its attorney fees.[5]

In late July, 2012, Stockwell and Capussi exchanged emails regarding what the Debtor owed Capussi and his company JC Fresh Farms. It is obvious from the emails that the parties disagreed about the amounts owed. Stockwell gave uncontradicted testimony that in 2012 Capussi asked if he could tell his bankers that the Debtor owed Capussi $2 million. According to Stockwell, Capussi was having financial trouble at the time. Stockwell testified that he told Capussi no. Despite that, according to Stockwell, he received a call from Capussi's bankers, asking Stockwell to confirm the $2 million indebtedness. He did not.

On further appeal, in 2013 the New Mexico Supreme Court reversed the Court of Appeals' decision in part, increasing Debtor's award to about $7.4 million.[6] CNMEC paid this judgment amount. After attorney fees were deducted, Debtor was left with about $5.45 million in cash, fully encumbered by the first lien of the Debtor's pre-petition secured lender.

This case was commenced as an involuntary Chapter 7 on January 30, 2014, and converted to a voluntary Chapter 11 case on May 8, 2014. On August 4, 2014, Capussi filed a proof of claim for $3,282,474. He amended his claim on March 19, 2015, changing the amount to $3,264,287.24. The amended claim includes an explanation of claim, a declaration, a UCC-1 financing statement, and a copy of the security agreement.

---

[5] *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 255 P.3d 324 (N.M. App. 2013). The New Mexico Court of Appeals reversed the breach of contract, punitive damages, and related post-judgment interest awards. The Court of Appeals upheld Debtor's negligence award but also CNMEC's right of offset. Debtor's negligence award, reduced by 80% comparative fault, totaled about $4.27 million. CNMEC's setoff amount, as established by the Court of Appeals, was $3.2 million. Before attorney's fees were paid, Debtor's award amounted to a little over $1 million.

[6] *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 301 P.3d 387 (N.M. 2013).

Debtor objected to Capussi's proof of claim on September 5, 2014. The resulting contested matter has been tried and is ready for decision.

## II. DISCUSSION

A.  In General.

Allowance of a proof of claim is governed by 11 U.S.C. § 502(a) and Fed.R.Bankr.P. 3001(f). A properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." *Kittel v. First Union Nat'l Bank (In re Kittel)*, 285 B.R. 344, at *6 (10th Cir. BAP 2002) (citing *Fullmer v. United States (In re Fullmer)*, 962 F.2d 1463, 1466 (10th Cir.1992), abrogated on other grounds, *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000)). A claim is deemed allowed unless an interested party objects. 11 U.S.C. § 502(a).

B.  Burden of Proof.

"The objecting party has the burden of going forward with evidence supporting the objection." *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517, 524 (10th Cir. BAP 2001), affirmed, 281 F.3d 1173 (10th Cir. 2002). The objecting party's evidence "must be of probative force equal to that of the allegations contained in the proof of claim." *Id.* "Once the objecting party has reached this threshold, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim." *Id.* (citing *Agricredit Corp. v. Harrison (In re Harrison)*, 987 F.2d 677, 680 (10th Cir.1993)). *See also In re Picacho Hills Util. Co., Inc.*, 515 B.R. 820, 824 (Bankr. D.N.M. 2014) (citing *Allen*); *In re Wedco Mfg., Inc.*, 2014 WL 3534043, at *1 (Bankr. D. Wyo. 2014) (same).

C.  Capussi's Hearsay Objection.

Capussi objected on hearsay grounds to Stockwell testifying about what he said to Capussi during the 2008 meeting in Leamington, Ontario. *See* Fed.R.Evid. 801(c) (hearsay is a

statement the declarant does not make while testifying at the current trial, offered to prove the truth of the matter asserted in the statement). The Court took the objection under advisement and has researched the law. The objection is overruled, because the testimony is admissible to provide completeness or context, and not to prove the truth of the matter asserted. "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." *Anderson v. U.S.*, 417 U.S. 211, 219 (1974). "The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Id.* at 221.

Courts have recognized that a witness should be able to testify about a conversation he had with a party opponent, because the statements of the party opponent are not hearsay (Fed.R.Evid. 801(d)(2)), and those statements cannot be understood by a judge or jury unless the other half of the conversation is in evidence. Thus, the witness is allowed to testify about what he said to provide context, rather than to prove the truth of the matter asserted in his out-of-court conversation. For example, in *U.S. v. Cesareo-Ayala*, 576 F.3d 1120, 1129 (10th Cir. 2009), the Tenth Circuit ruled that a written report of two conversations between a witness [Mendez] and a criminal defendant [Cesareo-Ayala] were admissible:

> The obvious purpose of including what Mendez said in presenting the conversation to the jury is that Mr. Cesareo-Ayala's words can be properly understood only in the context of Mendez's remarks. In context, Mr. Cesareo-Ayala's statements strongly suggest that he was involved in the (aborted) transaction with Steward and wanted to get together with Mendez to obtain the proceeds. If the jury could not hear Mendez's side of the conversation, however, it would have to speculate about what was really going on.

576 F.3d at 1129. *See also U.S. v. Colon-Diaz*, 521 F.3d 29, 38 (1st Cir. 2008) (admitting a hearsay statement that put a non-hearsay statement into context and made it intelligible); *U.S. v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (admitting statements offered to provide context to non-

hearsay statements); *U.S. v. Walter*, 434 F.3d 30, 34 (1st Cir. 2006) (same). *See generally M. Graham, Federal Practice and Procedure*, (2011 interim ed.), § 7005, n. 6 and accompanying text (citing cases that allowed one side of a conversation into evidence, which would be hearsay if introduced to prove the truth of the matters asserted, to give context to the other side).

Stockwell's out-of-court statements to Capussi provide context for Capussi's statements to Stockwell (testified to by Stockwell and Capussi, without objection). Without this context, the evidence about who said what at the meeting would be one-sided and unhelpful to the Court. The discussion at that meeting is the most important evidence about the validity of the Capussi's $3.2 million claim. Further, Capussi was not denied the opportunity to cross-examine Stockwell about his prior statements as Stockwell was present at the hearing. The Court will allow the testimony to come in for completeness or context, and not for the truth of the matters asserted.

D. <u>Debtor Carried Its Initial Burden of Challenging Capussi's Claim</u>.

Capussi's properly filed proof of claim is prima facie evidence of the validity and amount of his claim against the Debtor. The Debtor, however, need only provide evidence of equal probative force to overcome this prima facie evidence. The Debtor carried this burden.

The Debtor provided the following evidence that makes the Court question Capussi's claim:

- Capussi's out-of-pocket advances and expenses were less than 5% of the $2 million claimed in October, 2008;
- The parties never had any agreement about how Capussi was to be compensated;
- For the other creditors receiving security agreements, the debt amounts were much smaller and seemed to be rationally related to amounts owed;
- Capussi was not able to articulate why the Debtor would agree to a debt of $2 million;
- For such a large debt amount, it seems logical that Capussi would insist on Stockwell initialing the hand-written amount;
- Stockwell testified that the security agreement had no debt amount filled in when he left Capussi's offices;
- In 2012 Capussi asked if could tell his bankers the Debtor owed him $2 million,

and Stockwell said no.

This evidence is sufficient to shift the final burden of persuasion to Capussi.

E. <u>Capussi Did Not Carry His Final Burden of Persuasion on the $3.26 Million Claim</u>.

Capussi did not carry his burden of persuasion. Capussi's only evidence for the amount and validity of his $3.2 million claim is the security agreement and his own testimony. There is no independent indication that Capussi is owed $3.2 million or that Stockwell agreed to such an amount. Stockwell's uncontradicted testimony is that the other security agreements included his signature or initials next to the hand-written debt amount. This testimony is supported by the proofs of claim filed by Nick Sauro and John Wright.

Neither the Debtor nor Capussi observed any of the normal business formalities usually associated with a substantial debt. Stockwell was foolish to leave what was essentially a blank check with Capussi. Capussi was foolish to work for years on the New Mexico greenhouse project with no agreement how he would be compensated, and then to fill in by hand the $2 million debt figure, without getting Stockwell to initial the hand-written amount. Although neither party is blameless, Capussi had the ultimate burden of presenting evidence of what the Debtor owed him. Capussi did an inadequate job of this, and therefore was unable to carry his burden of persuasion.

F. <u>Capussi Carried His Burden of Persuasion as to $108,000</u>.

Although Capussi failed to carry his burden as to the $3.2 million he claims he is owed, Capussi does not have a claim of $0.

During the final hearing, Debtor's counsel conceded that the maximum amount Capussi could be owed, based on available documentation, was $108,000. The Court analyzed the

documents submitted into evidence and attempted to calculate an amount for which there is support. Different totals can be calculated, but it seems that $108,000 is reasonable based on documented expenditures and the 8.75% interest that accrued between November 1, 2008 and the petition date.

Based on the documentation of expenses submitted into evidence and the Debtor's admission at the final hearing, the Court finds that Capussi has an allowed claim against the debtor in the amount of $108,000.

### III. CONCLUSION

The Debtor successfully challenged the prima facie allowability of Capussi's $3.2 million claim, and Capussi failed to carry his burden of persuading the Court the claim was allowable in full. The Court finds, however, that Capussi does have an allowed claim for $108,000.

The Court will prepare and enter a separate order allowing Capussi's claim in the amount of $108,000.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: August 18, 2015.

Copies to:

Christopher M. Gatton
10400 Academy Rd. NE, #350
Albuquerque, NM 87111

John Stockwell
90 Townline Road South
Leamington, Ontario N8H 4G2

James A. Askew
320 Gold Ave. SW, Ste. 300A
Albuquerque, NM 87102

Daniel A. White
320 Gold Ave. SW, Ste. 300A
Albuquerque, NM 87102