UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SUNNYLAND FARMS, INC.,                          Case No. 14-10231-t11

       Debtor.

## MEMORANDUM OPINION

The debtor confirmed a plan of reorganization in this case several years ago. After confirmation, the Court resolved a dispute between the reorganized debtor and one of its creditors about whether the creditor was entitled to receive stock in the reorganized debtor. The Court ruled that he was. The debtor and creditor now disagree about the debtor's proposed merger with another corporation. The debtor asks the Court to enforce a provision of its bylaws allegedly requiring the creditor to arbitrate the dispute. Having reviewed the briefing and the law on the issue, the Court concludes that it lacks jurisdiction to compel arbitration. The Court also concludes that there are other problems with the motion, which therefore will be denied.

                                             I.        FACTS

To control expenses, the parties have asked the Court to rule on the dispute without taking evidence at a final hearing. The Court therefore makes the following findings of fact from the record in this case,[1] and solely for the purpose of ruling on the motion:

---

[1] Most of the findings are taken from the dockets in the bankruptcy case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same). The court also took judicial notice of the New Mexico Secretary of State web site (www.sos.nm.us) listing the formation date and organizer of Bright Green Grow Innovations, LLC.

Sunnyland Farms, Inc. ("Debtor") is a New Mexico corporation that owned a large greenhouse near Grants, New Mexico. Jerry Capussi assisted Debtor in developing its New Mexico business and became a general unsecured creditor. Before plan confirmation, John Stockwell was the Debtor's sole shareholder.

Due to a large fire at the former greenhouse location, the Debtor fell on hard times. Creditors filed an involuntary bankruptcy case against Debtor, which it converted to a voluntary Chapter 11 case.

On January 14, 2015, the Debtor filed its fourth amended plan of reorganization (the "Plan"). In general terms the Plan proposed pay each general unsecured creditor 1% of its allowed claim, or (at the creditors' option) to issue one share of stock in the reorganized Debtor for every dollar of allowed claim. Mr. Stockwell received nothing on account of his stock ownership. However, his wife Lynn Stockwell had a $12,797,282 unsecured claim against the Debtor. She elected to receive stock.

Article 7 of the Plan provides in part:

7.4 After Confirmation of the Plan, the Reorganized Debtor shall be free to manage its affairs without further Order of this Court.

7.6 The Debtor shall be free to sell its property after Confirmation, subject to liens thereon and the provisions of this Plan and any Order of Confirmation.

Article 8 of the Plan (Retention of Jurisdiction) provides:

The Court shall retain jurisdiction after the Effective date of this Plan for all purposes provided for by the Code, by this plan, and by applicable law, including, but not limited to, resolution of claims objections as provided for in the Plan, interpretation or construction of the Plan, hearing and ruling on pending adversary proceedings and those provided for in paragraph 7.6 above, and valuation as may be necessary for implementation of the Plan.

The Court confirmed the Plan on April 8, 2015. As only Lynn Stockwell elected to receive shares rather than cash, she became the sole shareholder, with 12,797,282 shares of stock.

Before Plan confirmation, Mr. Capussi filed a claim for $3,264,287.24. The Debtor objected. The Court held a final hearing on the claim objection and on August 18, 2015, allowed the claim in the amount of $108,000.

Mr. Capussi immediately filed a motion to compel the Debtor to issue him 108,000 shares of stock. The Debtor disputed Mr. Capussi's right to receive stock instead of cash, arguing that the time to make the election had passed. The dispute was submitted to the Court on the briefs, and on March 28, 2016, the Court ruled that Mr. Capussi had the right to receive stock if he so chose. Thus, about a year after Plan confirmation Mr. Capussi became the second (and very minority) shareholder of the reorganized Debtor, owning .6% of the stock.

Meanwhile, in December 2015 Lynn Stockwell as the sole shareholder approved a transaction pursuant to which the Debtor transferred all its assets to Bright Green Grow Innovations, LLC, a New Mexico limited liability company ("Bright Green").[2] As part of the transaction Debtor's shareholders would "swap" all their shares for Bright Green shares. Lynn Stockwell was the majority owner of Bright Green.

By the time Mr. Capussi became a shareholder in late March 2016, the Debtor had already transferred its assets to Bright Green. The stock swap, however, had not occurred.

At a meeting held December 16, 2016, Debtor's board of directors adopted Bylaws, Article IX of which provides:

> The corporation may sell or transfer assets during a dispute between the Shareholders only with authorization of its Board of Directors given at a special meeting called for that purpose and with the subsequent approval by no less than two-thirds (2/3) vote of the Shareholders.

---

[2] Bright Green was organized by John Stockwell in December 2015.

In the event of a dispute as to value of the asset, the proceeds of any sale, exchange, trade etc. shall be held on a per share basis at the corporations Law Office. The amount of the proceeds required will be established by using the latest current appraisal value for any asset as guidance until the dispute between the parties is resolved.

The amount to be held until the dispute is resolved will be twice the amount of the Shareholders holdings. As an example, if the Shareholder in dispute has 10,000 shares of the corporation's stock and the total proceeds or exchange is $1.00 on a per share basis the required amount to be held shall be $20,000 until the dispute is resolved.

Each Shareholder is responsible for his or her legal costs and the cost of a new appraisal or appraiser costs in resolving any issue between the parties.

The parties will attempt to resolve any dispute arising out of or relating to these Bylaws through friendly negotiations amongst the parties. If the matter is not resolved by negotiation, the parties will resolve the dispute using the below Alternative Dispute Resolution (ADR) procedure.

Any controversies or disputes arising out of or relating to this Agreement will be resolved by binding arbitration under the rules of the American Arbitration Association. The arbitrator's award will be final, and judgment may be entered upon it by any court having proper jurisdiction.

The corporation relies on these Bylaws, how it manages the sales and transfers of company stock and other normal or special corporate behavior.

Any asset of the corporation will be determined by current fair market value by an accredited appraiser and delivered to the arbitrator within 30 days of the dispute notification.[3]

A shareholder meeting of Debtor's shareholders was convened on August 16, 2017, to consider the stock swap. Mr. Capussi attempted to attend the meeting with his lawyers. The Stockwells turned the lawyers away, saying they could not attend the meeting. Conflict and disagreement ensued.[4] It seems clear, however, that Mr. Capussi objected to the stock swap. After

---

[3] The title of the Bylaws indicates they were drafted, at least in part, on June 25, 2003, even though the last page says they were adopted on December 16, 2016. Article IX does not seem to match the other articles of the Bylaws. In Article IX, "Shareholder" is capitalized, unlike the rest of the Bylaws. Article IX sometimes refers to "Shareholders" and other time to "parties." The font for the last two paragraphs of Article IX is different from the rest of the Bylaws. The subject matter of the article appears tailored to the dispute between the Stockwells and Mr. Capussi. It could be that Article IX was drafted by the Stockwells after Mr. Capussi became a shareholder and added to the Bylaws, in anticipation of the stock swap dispute.

[4] The meeting was transcribed. The transcript reveals, among other things, that the Stockwells joined or left the meeting 14 times.

Mr. Capussi and his attorneys left the meeting, Lynn Stockwell voted her 99.4% of shares to approve the stock swap.

The parties discussed the matter after the meeting and their counsel exchanged correspondence. An April 25, 2018, email from Mr. Capussi's counsel to Debtor's counsel stated: "Mr. Capussi has not filed a suit to set aside the transaction and does not intend to do so at this time."

The Stockwells and Mr. Capussi attempted, but failed, to resolve their differences through mediation. Although Mr. Capussi has not mounted a legal challenge to the stock swap, on June 28, 2018, Debtor filed the motion to compel Mr. Capussi to arbitrate the dispute.

## II. DISCUSSION

A. Jurisdiction.

A threshold question is whether the Court has jurisdiction to rule on the motion to compel arbitration. Mr. Capussi argues that it does not: the proceeding is too far removed from the bankruptcy case, in both time and subject matter.

Federal court bankruptcy jurisdiction is set out in 28 U.S.C. § 1334 (Bankruptcy cases and proceedings):

> (a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.
> (b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

District courts may refer a portion of their bankruptcy jurisdiction to bankruptcy courts, 28 U.S.C. § 157(a).[5] While the limits of bankruptcy court jurisdiction, as opposed to district court jurisdiction, are not always clear, *see, e.g.*, *Stern v. Marshall*, 564 U.S. 462 (2011), that difficulty is not relevant here. Rather, the question is whether the motion to compel comes within the federal court's § 1334 jurisdiction, not the jurisdiction referred to this Court pursuant to § 157(a).

1. Bankruptcy Jurisdiction under § 1334 in General. Section 1334 has four distinct grants of jurisdiction:

    a. Cases under Title 11. District courts are given exclusive jurisdiction over "cases under title 11." This means bankruptcy cases themselves, such as this chapter 11 case. *See* 1 Collier on Bankruptcy ¶ 3.01[2] (16th ed.);

    b. Arising under. District courts are given original but not exclusive jurisdiction over proceedings "arising under title 11," i.e., proceedings involving causes of action created by title 11. *See Gupta v. Quincy Medical Center*, 858 F.3d 657, 662 (1st Cir. 2017), citing *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006). An example is an action to avoid a preferential transfer under 11 U.S.C. § 547;

    c. Arising in. District courts are given original but not exclusive jurisdiction over proceedings "arising in . . . cases under title 11." These are proceedings "that are not based on any right expressly created by title 11, but nevertheless would have no existence outside of the bankruptcy." *Gupta*, 858 F.3d at 662-63, citing *Middlesex Power Equip. & Marine, Inc. v. Town of Tyngsborough, Mass.* (*In re Middlesex Power Equip. & Marine, Inc.)*, 292 F.3d 61, 68 (1st Cir.

---

[5] § 157(a) introduces the concept of "core proceedings" that bankruptcy courts may hear and determine. By Misc. Order no. 84-0324, the District Court for the District of New Mexico refers all cases and proceedings listed in 28 U.S.C. §§ 157(a) and 1334 to this Court, including all core proceedings.

2002). Examples include orders to turn over property and determinations of the validity, extent, or priority of liens. *Gupta*, 858 F.3d at 663;

    d. <u>Related to</u>. Finally, district courts are given original but not exclusive jurisdiction over proceedings that are "related to cases under title 11." A proceeding comes within this jurisdictional grant "if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1985); *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990); *In re Houlik*, 481 B.R. 661, 674 (10th Cir. BAP 2012) (citing *Gardner*).

  Here, the motion to compel is not a case under title 11, does not arise under title 11, and does not arise in a case under title 11. The question, then, is whether it is "related to" a case under title 11.

  2. <u>Post-confirmation "related to" jurisdiction</u>. The district court's § 1334 bankruptcy jurisdiction is the same pre- and post- plan confirmation. *Houlik*, 481 B.R. at 675. "However, it is generally accepted that the court's jurisdiction narrows to some extent after plan confirmation with respect to 'related to' jurisdiction." *Id.; see also In re Gen. Media, Inc.*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) ("all courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks."). The Seventh Circuit reasoned:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.

*Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991); *see also In re Gen. Media, Inc.*, 335 B.R. at 73 (quoting *Pettibone*); *In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 106–07 (1st Cir. 2005) ("as the corporation moves on, the connection [to the underlying bankruptcy case] attenuates.").

3. <u>The "close nexus" test</u>. While the Tenth Circuit has not articulated a test for post-confirmation "related to" jurisdiction, other circuits have. The Third Circuit applies a "close nexus" test for addressing post-confirmation "related to" jurisdiction. "At the post-confirmation stage, the claim must affect an integral aspect of the bankruptcy process – there must be a close nexus to the bankruptcy plan or proceeding." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004). This "close nexus" test has been adopted by the Ninth Circuit, *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005), and the Fourth Circuit, *Valley Historic Ltd. Partnership v. Bank of New York*, 486 F.3d 831, 837 (4th Cir. 2007). *See also In re DPH Holdings Corp.*, 448 Fed. App'x 134, at *2 (2d Cir. 2011) (unpublished).

The Fifth Circuit uses a narrower standard: "[post-confirmation] the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001), quoting *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998).

This Court earlier used the "close nexus" test for determining post-confirmation related-to jurisdiction. *See In re Hart Oil & Gas, Inc.*, 534 B.R. 35, 45 (Bankr. D.N.M. 2015). In doing so, the Court relied in part on Judge Lynch's cogent opinion in *In re Angel Fire Corp.*, 2013 WL 1856350 (D.N.M.). Judge Lynch concluded that "the Tenth Circuit and its B.A.P. have effectively applied the close-nexus test to the few post-confirmation disputes that have comes to their attention," *In re Angel Fire Corp.*, 2013 WL 1856350, at *12. The Court also relied on *Houlik*, 481 B.R. at 676 (indicating that it would either adopt the close nexus test or one even narrower).

-8-

Thus, at least for plans of reorganization rather than liquidation,[6] the Court will use the "close nexus" test.

4. <u>Defining the "close nexus" test</u>. While the close nexus test has been defined in different ways, most courts use the following:

> a close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.

*In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013); *see also In re Resorts Int'l, Inc.*, 372 F.3d at 168-69; *In re DPH Holdings Corp.*, 448 Fed. App'x 134, 137 (2d Cir. 2011); *Valley Historic Ltd. Partnership v. Bank of New York*, 486 F.3d 831, 836 (4th Cir. 2007); *In re HNRC Dissolution Co.*, 2019 WL 326484, n. 4 (6th Cir.). The Third Circuit opined that the close-nexus test "recognized the limited nature of post-confirmation jurisdiction but retains a certain flexibility." *Resorts Int'l*, 372 F.3d at 166-67.

B. The Court Lacks Jurisdiction to Compel Arbitration.

1. <u>Under the "close nexus" test, the Court lacks "related to" jurisdiction</u>. Applying the "close nexus" test to this dispute, the Court concludes that it does not have "related to" jurisdiction to compel Mr. Capussi to arbitrate his alleged dispute with the Debtor. The dispute does not affect the "interpretation, implementation, execution, consummation, or administration of the [Debtor's] confirmed plan." Under the Plan, Debtor was free to manage its affairs without further order of this Court, and free to sell its property. It has done both. The Bright Green share swap was not mentioned in the Plan, which was confirmed nearly four years ago. Time has separated the

---

[6] The Court's post-confirmation "related to" jurisdiction may be broader if a confirmed plan is one of liquidation rather than reorganization. *See, e.g., Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr.)*, 410 F.3d 100, 107 (1st Cir. 2005); *Houlik*, 481 B.R. at 675 (citing *Boston Regional* with approval).

reorganized Debtor from this Court, and its "related to" jurisdiction, significantly. Debtor is and should be free to operate without Court supervision or control. If there is a dispute with Mr. Capussi over the Bright Green transaction, it should be taken up in state court.

2. <u>The Plan's "Retention of Jurisdiction" does not change the result</u>. Article 8 of the Plan (quoted above) addresses retained post-confirmation jurisdiction. Debtor's dispute with Mr. Capussi does not fall within the retained jurisdiction article. Furthermore, parties cannot use such retained jurisdiction provisions to expand the Court's jurisdiction beyond that granted by § 1334:

> Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. But neither the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction "cannot be conferred by consent" of the parties. *Coffin v. Malvern Fed. Sav. Bank,* 90 F.3d 851, 854 (3d Cir.1996). Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization. *In re Continental Airlines, Inc.,* 236 B.R. 318, 323 (Bankr.D.Del.1999), *aff'd,* 2000 WL 1425751 (D. Del. September 12, 2000), *aff'd,* 279 F.3d 226 (3rd Cir.2002).

*Resorts Int'l*, 372 F.3d at 161.

C. <u>There are Other Problems with the Motion to Compel</u>.

Apart from the jurisdiction issue, the Motion lacks merit for several other reasons. First, there is no actual legal controversy to arbitrate, as no lawsuit has been filed. Grumbling and (apparently) idle threats of litigation likely are insufficient to trigger arbitration rights or obligations. Second, the dispute resolution language in the Bylaws may have been adopted after Mr. Capussi became a shareholder. If so, he may not be bound by them. *See, e.g., Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) ("arbitration is a matter of contract."). Third, the dispute, if there is one, relates to the advisability of merging Debtor with Bright Green, rather than to the value of Debtor's assets. As such, the dispute resolution provisions in the Bylaws may not apply. Finally, if the stock swap received the requisite shareholder approval, Debtor's Bylaws may no longer be relevant.

III. CONCLUSION

This Court does not have post-confirmation jurisdiction to compel Mr. Capussi to arbitrate his alleged dispute with the reorganized Debtor. Even if it had such jurisdiction it is questionable whether compelling Mr. Capussi to arbitrate would be possible and/or warranted. The Court therefore will deny the motion, by separate order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: February 8, 2019

Copies to: counsel of record